UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles L. JOHNSON,
Defendant-Appellant.

No. 79–1132.

United States Court of Appeals,
Tenth Circuit.

Argued May 8, 1980.

Decided June 6, 1980.

Rehearing Denied July 18, 1980.

D. C. Thomas, Oklahoma City, Okl., for defendant-appellant.

Eleanor J. Darden, Asst. U. S. Atty. (Larry D. Patton, U. S. Atty., John E. Green, First Asst. U. S. Atty., Oklahoma City, Okl., on the brief), for plaintiff-appellee.

Before BARRETT and DOYLE, Circuit Judges, and MILLER,* Judge.

MILLER, Judge.

Appellant was convicted by a jury on five counts of mail fraud in violation of 18 U.S.C. § 1341. The district court sentenced him to a term of five years' imprisonment on each of counts I and II, to run concurrently; five years on count III, to run consecutively; four years on count IV, to run concurrently with count III; and five years on count V, to run concurrently with the previous counts.[1] The co-defendant, Charles Bazarian, pled nolo contendere to counts I and IV and was sentenced to four years' imprisonment, which was suspended, fined, and ordered to make restitution of $60,000. We affirm.

In brief, count I charged that appellant and Bazarian, along with four other individuals, devised a scheme lasting from February to September of 1977 to defraud persons seeking hospital and medical benefits by inducing them, in the name of "United Health and Retirement Association" (UHARA), to pay dues and contributions to an alleged plan under which members and their beneficiaries would receive benefits (with a life-time maximum of one million dollars) in event of sickness, accident, disability, retirement, death, or other interruption of earnings, without the intent and capability of performance and knowing that such representations regarding the plan were false; that no benefits were ever consummated and no monies were ever placed in trust or reserves for the payment of claims notwithstanding that in excess of $253,146 in membership fees and contributions was received from members of UHARA, which monies were distributed to appellant and Bazarian or others at their direction; and that over 200,000 pieces of mail were sent through the Postal Service to various persons in several states for the purpose of inducing them to join UHARA. Each of the remaining counts charged substantially the same offense, but also specified a particular individual who was allegedly defrauded.

BACKGROUND

When viewed in the light most favorable to the government[2] the evidence shows the following:

The first meeting out of which grew the UHARA operation took place in early January of 1977 in Kansas City, Missouri, between appellant, who was from Austin, Texas, an insurance businessman named Jack Amason from Dallas, Texas, a Kansas City lawyer named Chris Mentrup, who was appellant's lawyer, and Bazarian, who had worked for appellant with a company called United Trust Co. and whom appellant had called to come up from Florida on his return trip to Oklahoma City, where he had an insurance agency, Central Management Systems (CMS). Amason had formerly

---

* The Honorable Jack R. Miller of the United States Court of Customs and Patent Appeals, sitting by designation.

1. At sentencing, the trial judge remarked: "It's true as the defendant says, his record heretofore is clear, however, the offense charged, the one the jury found guilt concerning, is a very serious matter, rip-off of the public . . . ." Anticipating that there would be an appeal, the trial judge then said:

I am going to impose a rather harsh sentence. It may sound bad to the defendant, and suggest that I will have an opportunity to review it if the Court affirms the conviction. The law is this: If the Court imposes, say, a low sentence and wishes to review it, the Court can never upgrade it, but you can always come down, and I'm not saying I will, I'm not saying it's a mistake. You also have a co-defendant in this case that hasn't been sentenced yet, and it's something I might look at, you know, with respect to equalizing the punishment.

2. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Wolf*, 561 F.2d 1376, 1378 (10th Cir. 1977).

worked for appellant in the insurance business. They discussed establishment of a self-funded health plan through an association under a recent act of Congress, Employee Retirement Income Security Act (ERISA), and signed an agreement drawn by Mentrup under which Bazarian would be paid a sixty percent commission to produce the business. On January 17 of 1977, a second meeting was held in Dallas, Texas, involving appellant, Amason, Mentrup, Gene Hawkins, an actuary, Jim Lane, a lawyer, and Bob King, an insurance executive. A brochure was designed by appellant and Amason, with the assistance of the others, to market the plan under the name of "National Health Association," later changed to "United Health and Retirement Association." It advertised coverage by the plan of various hospital and medical doctor expenses, with a lifetime maximum benefit of one million dollars. The brochure was first printed in Austin by a printer selected by appellant, but after running out of copies, appellant sent the negatives to Oklahoma City where a lower bid had been received. Over 230,000 mailings were sent out through the Delong Mailing Service of Oklahoma City, with billing therefor to CMS. Each mailing included a "flyer" designed by Bazarian and a card to be returned to UHARA if the recipient was interested in receiving information about the UHARA plan, and a call by a salesman would result if interest was indicated. Shortly afterwards, Amason advised that he did not wish to be further involved. In February, appellant, Mentrup, and Bazarian met in Kansas City. Bazarian's mother-in-law, who worked for CMS, was appointed plan administrator, and two of his brothers-in-law were appointed plan trustees. Handling of monies was agreed upon (and subsequently carried out) as follows:

Each $30 membership fee: divided equally among appellant, Bazarian and Mentrup.

Contributions to the plan: 15% retained in the UHARA bank account for salaries and expenses; 85% transferred to C. L. Johnson Agency Account,[3] from which 15% was sent to appellant about once a week (totaling $24,000 for the period Feb. 11 to June 3, 1977), "because it was his deal"; the remaining 70% transferred to the CMS account, with 50% going to salesmen for commissions and 20% for salaries, phones, rent, and mailing of brochures. The various bank accounts were in Oklahoma City.

A plan description, dated April 13, 1977, was filed by Bazarian's mother-in-law, as plan administrator, with the U.S. Department of Labor, which had administrative authority over ERISA. The filing indicated that the address of UHARA was the National Press Building, Washington, D.C., and that the date of the plan was March 15, 1977. The Washington, D.C., address was, in actuality, merely a mail drop with a phone answering service, and UHARA's operations were conducted out of the CMS offices in Oklahoma City to which mail received at the Washington, D.C., address was forwarded.

As of June 3, 1977, over 700 members were enrolled in the UHARA plan from several states; deposits of fees and contributions amounted to over $347,000, but only $1,638.75 remained in the UHARA account. No fund was established for payment of claims, although Hawkins, the actuary, had recommended that a reserve of 20% of the contributions be set aside under such a plan for claims in the first year; and claims received before appellant's indictment totaled in excess of $61,000,[4] but were not paid because there was no money to pay them.

Bazarian testified that, for all practical purposes, he and appellant were the "principals" in the scheme. Although appellant lived in Austin, Texas, he came to Oklaho-

---

**3.** The plan administrator was authorized by appellant to write checks on this account, and she appears to have been the only one who did so. Appellant was not authorized to write checks on the account.

**4.** The plan administrator testified that UHARA started to receive claims after the first of June of 1977.

ma twice between January and June in regard to the UHARA operations, and he and Bazarian talked by telephone once a day or every other day about how the salesmen were doing and what areas they were working in. Bazarian was in charge of the salesmen and made the decisions on "day to day operations," but "basic problems" were discussed with appellant.

The plan administrator testified that appellant called her the first part of July of 1977 to find out why his check was late and that she told him—

> that there wouldn't be any money coming, as that money had been used to pay attorneys' fees and he became very upset and made some remarks about Charles Bazarian and then I became upset and I told him the reason we had to have the money for the attorneys' fees was because Chris Mentrup didn't do what he was supposed to do to begin with when he set up the association, that we had followed his instructions and that is why we had gotten into the predicament we were in.

The individuals specified in Counts II–V of the indictment were: Marlin E. Smith of Lyons, Nebraska; Ms. Ruth F. Decker of Lahoma, Oklahoma; Mrs. Arthur H. Phipps, Jr., of Oklahoma City; and Roscoe R. Booth of Alma, Arkansas. Smith, Decker, and Phipps testified to taking out a membership in UHARA and enrolling in a UHARA plan after receiving a card in the mail, sending it to UHARA, and being visited by a salesman, and making out a check to UHARA for various periods of coverage (Smith—$678; Decker—$260; Phipps—$187.70). Booth testified that he answered an advertisement in the paper and, when called on by a salesman, took out a member-

ship in UHARA and enrolled in a UHARA plan, with three months' coverage, paying $30 for membership and $50 for coverage.

In May of 1977, an investigation of UHARA was made by a compliance officer from the U.S. Department of Labor. He testified that it appeared that he had discovered a mail fraud case and that he received permission to discuss his findings with U.S. Postal Service inspectors. A postal inspector then conducted an investigation. Indictment of appellant and Bazarian eventually followed on September 6, 1978.

## OPINION

■ Appellant argues that the verdict was not sustained by sufficient evidence and was against the clear weight of the evidence in that there was no showing that he devised or intended to devise any scheme or artifice to defraud as contemplated by 18 U.S.C. § 1341.[5] However, the evidence clearly shows that appellant was a prime mover and principal in the conception, organization, and activities of UHARA; further, that these activities were so conducted, through use of the Postal Service, as to obtain money by false or fraudulent pretenses, representations, or promises. Assuming that UHARA was originally conceived as a legitimate enterprise,[6] it was soon devised as a scheme to defraud in February of 1977 when, in the face of Hawkins' recommendation that a reserve of 20% of the contributions be set aside under such a plan to cover claims in the first year, an agreement to handle the monies was reached, as set forth above, with no reserve established for the payment of claims. Appellant, Bazarian, and Mentrup were parties

---

**5.** 18 U.S.C. § 1341 provides as follows:

> Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or . . . for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives there-

from, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**6.** Appellant argues that UHARA was "a sound and workable program when properly managed as conceived by Appellant."

to the agreement, which was carried out, with no claims ever being paid.

■ In addition to the agreement by appellant, Bazarian, and Mentrup for the handling of monies, with no reserve established for the payment of claims, from which the specific intent to defraud of a person experienced in the insurance business could clearly be inferred, appellant, as a person of such experience, was so intimately connected with the UHARA operation that his failure to be concerned with more than his weekly checks under the agreement can only be characterized as "reckless indifference" tantamount to knowledge of the falsity of the representations and promises regarding UHARA. *United States v. Love*, 535 F.2d 1152, 1158 (9th Cir.), *cert. denied*, 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 119 (1976). Appellant not only received his $10 share of each $30 membership fee, but weekly payments of his 15% off the top of contributions to the UHARA plan, "because it was his deal." He kept in almost daily touch with Bazarian on the activities of the salesmen, and basic problems of the UHARA operation were discussed with him.

We are satisfied that the evidence discussed above was more than sufficient to sustain the verdict, that the verdict was not against the clear weight of the evidence, and that, contrary to appellant's argument, the district court did not err in denying appellant's motions for a directed verdict. *United States v. Seasholtz*, 435 F.2d 4 (10th Cir. 1970).

■ Appellant argues that the district court erred in admitting Government Exhibits 15 (cancelled check to UHARA for $678 from Marlin E. Smith), 17 (UHARA brochure given to Roscoe R. Booth by salesman), and 22 (UHARA brochure given to Mrs. Ruth F. Decker by salesman), because these were not produced pursuant to the court's order upon appellant's discovery motions until after trial was commenced. Appellant argues that the exhibits prejudiced the jury against him. However, we note that other copies of the UHARA brochure,

not objected to, are in the record and that Marlin E. Smith testified that he had paid $678 for membership in the UHARA plan, so that the objected-to exhibits would merely be corroborative and cumulative and could hardly be described as prejudicial. *United States v. Bowers*, 593 F.2d 376 (10th Cir.), *cert. denied*, 444 U.S. 852, 100 S.Ct. 106, 62 L.Ed.2d 69 (1979).

■ Appellant also argues that he was prejudiced by testimony relative to claims because, although the claims were not introduced into evidence, the Government failed to make them available for inspection until the second day of trial. However, the transcript indicates that on the Friday before trial, which commenced on Monday, appellant's lawyer was told that the claim files were available to check against a summary sheet which had been prepared by the postal inspector, copy of which had been given appellant's lawyer; also, that, at appellant's expense, copies of claims could be made. There is no allegation of bad faith on the part of the Government. Also, it appears from the transcript that appellant's counsel cross-examined the postal inspector quite thoroughly and effectively on the subject of claims, bringing out that the period covered by the indictment was February to September of 1977, whereas the postal inspector's calculation of $61,816.29 on fifty-nine claims covered a period extending to indictment on September 6, 1978. Wherein appellant was prejudiced on this point does not appear.

AFFIRMED.