UNITED STATES of America, Plaintiff/Appellee,

v.

Grant C. AFFLECK, Defendant/Appellant.

No. 84–2630.

United States Court of Appeals, Tenth Circuit.

Nov. 7, 1985.

---

David Schwendiman (Brent D. Ward, U.S. Atty., with him on the briefs), Asst. U.S. Atty., Salt Lake City, Utah, for plaintiff/appellee.

A. Brent Carruth and Eric A. Goodwin, Van Nuys, Cal., for defendant/appellant.

Before BARRETT and LOGAN, Circuit Judges, and THOMPSON,* District Judge.

BARRETT, Circuit Judge.

Grant C. Affleck (Affleck or Appellant) appeals his conviction following a six-week trial before a 12–person jury on eight counts of securities fraud pursuant to 15 U.S.C. § 78j and 17 C.F.R. § 204.10b–5, one count of causing a person to travel in interstate commerce for the purpose of executing a scheme to defraud under 18 U.S.C. § 2314, and one count of bankruptcy fraud under 18 U.S.C. §§ 152 and 2. Affleck was acquitted of ten counts of mail fraud under 18 U.S.C. § 1341 (one count of mail fraud was later dismissed, following the federal grand jury indictment, due to the death of the affected victim-witness) and on one count of bankruptcy fraud.

## FACTS

This case involves the business transaction of appellant, Affleck, in his position as owner/manager of AFCO enterprises, a company which dealt primarily with real estate development in and around Salt Lake City, Utah. Prior to 1981, AFCO had been experiencing problems with its cash flow and was having difficulty obtaining loans from conventional lending institutions. In search of alternative sources of capital, appellant began to seek investments from private citizens.

To raise capital in this fashion, Affleck sold promissory notes on behalf of AFCO. AFCO had received permission from the Utah Securities Commission to engage in these types of sales. However, the information supplied to the Commission, detailing the financial soundness and investment risks of dealing with AFCO, was not included with the information provided to the potential investors. (R., Vol. XXI, pp. 2369–70, 2532.)

Appellant was able to convince many homeowners to obtain a second mortgage on the equity in their homes and then to loan the money received to AFCO in return for a promissory note from AFCO. Affleck was able to gain access to many individuals through his connections with the Mormon Church and his promise of a fail-safe investment. (R., Vol. XXI, p. 2479.) He assured his potential clients that in the company's fourteen year history it had never had any problems making payments and he said, he'd never had a dissatisfied customer. (R., Vol. XVII, p. 1696, Vol. XXI, pp. 2364, 2521.)

While Affleck was making these representations, the truth was quite different. AFCO had many prior customers so unhappy that they had filed lawsuits in an attempt to collect monies owed by AFCO. Although appellant told his investors that their money would be used to facilitate further development at several resorts in Utah, the money was in fact needed to meet AFCO's already existing debts. The investors were promised many bogus benefits, including a ten percent return on their money, leases on luxury cars, free weekends at Osmond's family suite at one of the resorts, and other lucrative enticements. (R., Vol. XXI, pp. 2365, 2533–34.)

Affleck promised that AFCO would handle all loan repayments directly, homeowners themselves would not be at any risk, and that income from time-share sales at the resorts would guarantee repayment in case there were any problems. (*See e.g.*, R., Vol. XI, p. 2450–2452.) Time-share sales were at a virtual standstill however, and the land itself had been pledged as security in many different loans.

Appellant also acquired the signatures of the investors on many documents of considerable importance without giving the signers an opportunity to read the documents (R., Vol. XXI, p. 2531), and Affleck often did not leave copies of the paperwork with the obligated party nor did he candidly explain the risks and obligations which the homeowners had undertaken. (R., Vol. XXI, pp. 2369, 2531, 2533.) He did not mention their rights of rescission nor were

---

* The Honorable Ralph G. Thompson, United States District Judge for the Western District of Oklahoma, sitting by designation.

the homeowners aware that they were signing back-dated documents. (R., Vol. XXI, p. 2543–45.)

In many instances the homeowners themselves expressed overwhelming confidence in Affleck after their initial meetings because he would establish a common bond through small talk about the Mormon Church and his connections therein. Affleck also spoke to them about the success he was having in securing a multi-million dollar loan from Japanese investors when in fact the loan never materialized. AFCO filed for bankruptcy under Chapter 11 in the Spring of 1982 and a grand jury indictment was returned against Affleck in November, 1983.

## THE APPEAL

On appeal, Affleck urges reversal of his conviction on the ten counts, *supra,* upon our consideration of the following grounds:

### Issues

(1) Whether the trial court abused its discretion in denying the appellant's motion for change of venue at the conclusion of an extensive voir dire; ·

(2) Whether prejudicial error was committed when the trial court granted the defense a four and one-half day continuance to examine newly available demonstrative evidence presented at trial by the government;

(3) Whether the defendant's Sixth Amendment rights were violated when the trial court admitted an expert's opinion testimony which included reliance on some hearsay statements;

(4) Whether the trial court erred by prohibiting defendant's "memory expert" from testifying;

(5) Whether the trial court abused its discretion by excluding impeachment testimony which it ruled was speculative and at best cumulative; and

(6) Whether it was reversible error for the trial court to refuse to dismiss the counts of mail fraud for lack of evidence.

## I.

### Discussion

From the outset appellant has argued that he was denied his due process rights to a fair trial because the jury was biased against him. He contends that because this case involves members of the Mormon Church, including some in the upper tiers of Church hierarchy, holding the trial anywhere in the District of Utah would result in the empaneling of a presumptively partisan jury. (Approximately seventy percent of the total population of Utah is Mormon.) Affleck also argues that excessive pre-trial publicity prevented him from receiving a fair trial.

Both before and after voir dire appellant moved to transfer venue in accordance with Fed.R.Crim.P. 21(a). The trial court properly denied the motions after determining through an extensive voir dire that a fair and impartial trial could be had in Utah. The determination of the trial court is entitled to a presumption of ·correctness and will not be overturned unless there is manifest error. *Patton v. Yount,* 467 U.S. 1025, —— n. 7, 104 S.Ct. 2885, 2889 n. 7, 81 L.Ed.2d 847 (1984), (citing the standard to be used in determining juror impartiality as set out in the landmark case *Irwin v. Dowd,* 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961)).

Although adverse pre-trial publicity did exist in the present case it did not permeate the community to such a degree that empaneling a fair jury would have been impossible. In this day of pervasive media coverage of all newsworthy events, it is unrealistic to think that the financial difficulties, declaration of bankruptcy, and the filing of adverse lawsuits against a prominent local businessman and his companies would go unreported. The amount of reporting concerning Affleck between 1981 and 1984 did not, however, reach a point where community attitudes were so hostile that he would be denied his Sixth Amendment rights. *Cf. Irwin v. Dowd, supra,* (where after a constant barrage of publicity a "lynch mob" attitude was rampant in

the community and law enforcement officers publicly declared that they would devote the rest of their lives to seeing that the accused was executed) and *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (a murder trial where a coroner's inquest filled an entire school gym with excited spectators after much sensationalized reporting). Here there were news accounts involving appellant but not like the incessant type that permeated the communities in *Irwin* and *Maxwell.*

■ To determine whether any jurors harbor prejudices against the accused, traditionally an oral voir dire is conducted. It is not, however, enough to ask a juror the stock questions, "have you formed an opinion as to the accused's innocence or guilt" or "will you be able to determine guilt based only on the evidence presented?" *Irwin, supra,* 366 U.S. at 724, 81 S.Ct. at 1643. "The jurors assurances that they are equal to the task are not dispositive of the rights of the accused and it remains open to a defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Brinlee v. Crisp,* 608 F.2d 839, 845 (10th Cir.1979), *cert. denied,* 444 U.S. 1047, 100 S.Ct. 737, 62 L.Ed.2d 733 (1980), quoting *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). Consequently, an examination of all of the circumstances is required. *Irwin, supra.* We have already touched on the lack of overwhelming adverse pre-trial publicity and a review of the voir dire will complete our analysis on this issue.

The trial court was extremely cognizant of the possibility of pre-trial prejudice however, and took the following measures to insure that each member of the jury brought an objective viewpoint into the courtroom: a 44–page questionnaire was submitted to 116 potential jurors which asked for detailed information about the person's religious affiliation, knowledge about any of the trial's participants, awareness of the events surrounding the trial, the degree of credibility one would assign to a Mormon on the witness stand, newspapers subscribed to, and any pre-conceived ideas or opinions about the matters at issue. In addition, the trial court reviewed these written answers of the veniremen before conducting oral voir dire and counsel were allowed every opportunity to probe further any troublesome matters during the individual oral interviews.

■ From the panel of 77 who were available for oral voir dire, only three were dismissed for expressing their opinion as to appellant's guilt. Most were dismissed for health or job related conflicts. Of the fourteen who were empaneled, half had never heard of appellant. Those who were acquainted with Affleck's name had only the most cursory knowledge about the facts of the case. The possession of mere knowledge is not enough to disqualify a juror.

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in the court.

*Irwin, supra,* 366 U.S. at 722, 723, 81 S.Ct. at 1642, 1643 (citations omitted.)

■ It is incumbent upon the appellant to demonstrate that a presumption of partiality exists. *Murphy, supra,* 421 U.S. at 800, 95 S.Ct. at 2036. Here appellant has fallen short of establishing the existence of an irrepressibly hostile community attitude. Furthermore, our independent examination of the cautious proceedings of the trial court leads us to agree with the trial court—the appellant received a fair trial from an impartial jury.

## II.

Next, Affleck alleges the trial court improperly admitted certain demonstrative evidence in violation of the court's own discovery order. Prior to the commencement of the trial, the court ruled that each party must disclose all documentary evidence or exhibits one month prior to trial unless in the exercise of reasonable diligence, he did not have that document available to him or it came to him afterward. Any documents discovered or coming into existence within the 30-day deadline were to be promptly turned over to the opposing party.

The challenged evidence consists of summaries of appellant's financial information to be used by the government's expert to illustrate his testimony. Although the original financial information from which the summaries were prepared was in the custody of a Trustee in bankruptcy, both parties' experts had access to the information. Affleck's expert, an accountant, testified that he himself had spent more than 400 hours going over the various records. The problem appears to be that after the trial had started, the government's experts completed some charts and enlargements and turned these over to the government's attorneys. Several hours after the government's attorneys received these exhibits they were turned over to appellant's counsel. Affleck's counsel promptly made a motion to exclude these exhibits and claimed surprise.

The day after the newly created evidence was turned over to the appellant, the trial court examined the evidence and denied Affleck's motion to exclude. The court did, however, require that a proper foundation be laid before admission of these exhibits would be allowed. The court also recessed the trial for four and one-half days to give Affleck's expert ample time to review the documents so appellant's counsel could prepare for cross-examination of the government's expert. Because Affleck's expert was court-appointed and funding had been exhausted, the court also authorized extra funds to compensate the expert for his additional time.

The standard of review in this matter is whether the court abused its discretion in admitting the evidence and whether such evidence was prejudicial to the appellant. *United States v. Bowers,* 593 F.2d 376 (10th Cir.), *cert. denied,* 444 U.S. 852, 100 S.Ct. 106, 62 L.Ed.2d 69 (1979). Although the appellant claims prejudice we fail to see how exhibits which were cumulative in nature, based on appellant's own records and which appellant's expert had ample time to review can be characterized as prejudicial. *See, e.g. United States v. Johnson,* 622 F.2d 507, 511 (10th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 359, 66 L.Ed.2d 218 (1980).

## III.

Affleck argues that the trial court improperly admitted the testimony of the government's expert accountant which contained damaging and inadmissible hearsay. Appellant claims that because the government did not produce the actual declarants of these hearsay statements that he was denied the right to confront witnesses as guaranteed by the Sixth Amendment.

The government's accountant, who was properly qualified as an expert, conducted a review of Affleck's financial records to determine AFCO's solvency during the period in question. He examined the overall financial picture of all of appellant's companies and whether any financial information was altered or misrepresented to investors. In addition to evaluating the records of the appellant, the expert also interviewed accountants who had previously worked for AFCO, other former employees of the organization, the Trustee in bankruptcy, and others. During the course of the expert's testimony he related what he had been told by those whom he had interviewed. This happened several times during the course of the expert's direct and re-direct examinations. Affleck's counsel made a timely objection in each instance.

In overruling appellant's objection the trial court cited Fed.R.Evid. 703 which provides that:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. *If of a type reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.* (Emphasis added.)

A careful reading of the italicized section of Rule 703 identifies three points: 1) that the information relied upon by a particular expert must be of the type reasonably relied on by all experts in that particular field (for general discussion *see* 49 A.L.R.Fed. 363); 2) that the information relied on by the expert must be used in forming the expert's opinion; and 3) that the information relied on by the expert to form his opinion need not be admissible in evidence.

The Notes of the Advisory Committee on the Proposed Rules accompanying Rule 703 explain that in practice experts commonly seek the statements and perceptions of others when forming their ultimate opinions. This brings the Rule in line with the practice of experts outside of the courtroom. The expert brings to bear his own education and experience in evaluating these statements. The additional information from others provides the expert a broader base of data upon which he will rest his eventual conclusion. Two safeguards are also built into the Rule: 1) the information relied on must be of a type reasonably relied on by other experts in the field, and 2) the expert's reliance on these out-of-court statements may be amply tested on cross-examination of the expert.

■ The threshold question, therefore, is whether conversations with a defendant's employees are of the type reasonably relied on by other experts in the accounting field in a case such as this. In *United States v. Head,* 641 F.2d 174, 181 (4th Cir.1981), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983), although the appellate court did reverse the defendant's conspiracy convictions, the court held that the expert testimony of an IRS agent who relied on conversations with defendant's own bookkeepers was the sort of material an expert might reasonably rely on under the circumstances; consequently, such hearsay was admissible. On re-direct examination the government's expert testified that the interviews which he had had with Affleck's employees were the type of information typically relied on by a professional accountant. (R., Vol. XXI, p. 2348.) Prior to this line of questioning though, the court did indicate that this information was of the type reasonably relied on by experts in such a situation. (R., Vol. XX, p. 2265.) Here, the expert's task of obtaining an overall financial picture from the records alone was difficult because appellant's financial reports were incomplete due to improper record keeping and purposeful destruction. Discussions with employees provided important verification of record-keeping practices.

Furthermore, Rule 703 requires that such information can be used only as the basis for the expert's opinion and not for the truth of the matter asserted. *United States v. Sowards,* 339 F.2d 401, 402 (10th Cir.1964). Here the expert testified that his conversations with Affleck's former accountants, past employees and the Trustee in bankruptcy were held after the expert had already reached tentative conclusions based upon his own examination of Affleck's documents. The interviews were used to corroborate or supplement opinions already formed and the expert further tested information he received from these talks by doublechecking the financial documentation (R., Vol. XXI, pp. 2347–2348).

When the expert recited this hearsay, it was used only to explain how he had formed some of his opinions and conclusions. It was not offered to prove the truth of the assertions made by the out-of-court declarants. The expert's testimony was not simply a summarizing of the out-of-court statements of others; it filled 302 pages of the record and consisted primarily of his conclusions based on the appellant's financial records. *See United States v. Lawson,* 653 F.2d 299, 302 (7th Cir.1981). (*Cf., United States v. Brown,* 548 F.2d 1194, 1206 n. 22 (5th Cir.1977) where the

hearsay of an IRS agent was offered for its truth and disallowed. The IRS agent was not offered as an expert and did not seek to testify as one. She discussed audited returns with the defendant's clients but did not bring these returns with her into court, thus preventing effective cross-examination. These conversations supplied her with the only information that she had relied on in forming her conclusion that the defendant overstated deductions.)

Throughout the direct and re-direct examination of the government's expert the court repeatedly instructed the jury that "[The government's expert] referred to various things that others had told him out of court and not under oath. Those matters, as I am sure you know, are hearsay. The only reason they were received and allowed in his testimony is because I have found that those are the type of subjects that may be relied upon by an accountant in forming opinions of the kind that Mr. Norman [the expert] testified to you about. And they are to be used by you, not for the truth of what was contained in them but in evaluating Mr. Norman's testimony and the opinions that he gave in determining whether those opinions have validity or don't have validity." (R., Vol. XX, p. 2265.) It cannot be assumed that the jury disregarded this charge.

Finally, on this issue, appellant contends that admitting this hearsay testimony was tantamount to a violation of the confrontation clause. This argument overlooks two important points: first, that the appellant had sufficient access to his own former employees, accountants, and the Trustee in bankruptcy and could have countered their statements; second, that the appellant had an adequate opportunity to cross-examine the government's expert. During cross-examination the impact of the expert's testimony could have been reduced by bringing out any problems involving reliance on these people's statements or their veracity. Affleck also had his own accounting expert available to rebut the government's proof. *United States v. Genser*, 582 F.2d 292, 299 (3rd Cir.1978) and *United States v. Lawson, supra,* at 302–303. In conclusion, we hold that the admission of the government's expert's testimony was proper.

### IV.

Affleck also argues that the trial court erroneously prohibited a "memory expert" from testifying. Here, the expert purportedly would have explained how well or how poorly people are able to remember events over the course of time and why they remember things the way that they do. Under Fed.R.Evid. 702, an expert may be allowed to testify if an untrained layman would not be able to make an intelligent evaluation of the evidence without such expert testimony. Specialized testimony explaining memory, however, is improper. The average person is able to understand that people forget; thus, a faulty memory is a matter for cross-examination. The trial court properly refused to admit the testimony of appellant's expert witness.

### V.

We hold that the appellant's remaining two contentions are, individually and collectively, without merit. The judgment of the trial court is AFFIRMED.