UNITED STATES of America,
Plaintiff-Appellee,

v.

Darrell Eugene LAWSON,
Defendant-Appellant.

No. 80–2313.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1981.

Decided July 9, 1981.

David E. Booth, Federal Public Defender,
East St. Louis, Ill., for defendant-appellant.

Lee Smith, Asst. U. S. Atty., Peoria, Ill., for plaintiff-appellee.

Before SWYGERT, Senior Circuit Judge,* SPRECHER, Circuit Judge, and HOFFMAN, Senior District Judge.**

SWYGERT, Circuit Judge.

Defendant Darrell Eugene Lawson appeals from his conviction on one count of extortion that affected interstate commerce [1] and one count of assault of a federal officer with a deadly weapon.[2] He argues that lay testimony on the issue of his sanity was improperly admitted, that hearsay evidence in the testimony of the Government's psychiatric expert denied him the right to confront adverse witnesses, and that he had the right to a government-appointed psychiatrist. We affirm his conviction.

I

In January 1980, the employees of the International Harvester Company were on strike. On January 29, Jimmy D. Dickey, the chief of plant protection at the company's East Moline, Illinois plant, received a telephone call from an unidentified male who told him that he had information about damage that was going to occur to one of the company's plants. Dickey contacted the FBI and made arrangements for future telephone calls to be recorded. The unidentified male, who was later identified as defendant Lawson, called again the next day. During this conversation, Lawson stated that "they're hitting every plant that's on strike." He said that a group of men were planning on doing between one and one-and-one-half million dollars damage to International Harvester plants in Canton, Ohio, Louisville, Kentucky, and East Moline. Lawson demanded $50,000 for the information he possessed. He mentioned

that he had worked for International Harvester, but that he had been fired. The money, he said, was his way of gaining revenge.

When Lawson called again on February 1, he said that he would write out the information he had in detail, but that he would omit all names. He did not want to give any names in case one of the group backed out, and he did not want them arrested. Lawson said the group had contacted him because of his expertise in the field of explosives. He agreed to meet with Dickey and a man from the Treasury Department.[3] In a phone call the next morning, Lawson informed Dickey the meeting would take place on Wednesday, February 6, near Ophien, Illinois. He gave Dickey specific instructions to get to the meeting place. When Dickey arrived near the site, he was to call Lawson on a CB radio. Lawson said his handle would be Mr. Spock, "just like Star Trek." Dickey's was to be Captain Kirk, and the man with him was to be Dr. McCoy.

On February 6, FBI Special Agents David Hirtz and Joseph Ondrula followed Lawson's instructions and met Lawson along a roadside. Lawson was wearing a blue ski mask, and he kept his right hand in his pocket. Hirtz told Lawson he was Dickey's boss from Chicago. Lawson then handed Hirtz a note that read,

Gentlemen, in the course of human events there comes a time of distrust. I don't know if you are going to try or even thinking of trying to rip us off. But be warned there are two 300 Winchester Magnums aimed at your heads right now. If you live up to your end, we will live up to ours. Thank you.

Hirtz told Lawson the money was three minutes away and that he would get it as soon as he had verified the information.

* At the time of oral argument, Judge Swygert was a circuit judge in active service; he assumed senior status on July 1, 1981.

** The Honorable Walter E. Hoffman, United States Senior District Judge for the Eastern District of Virginia, is sitting by designation.

1. 18 U.S.C. § 1951.

2. 18 U.S.C. §§ 111, 114.

3. The Bureau of Alcohol, Tobacco and Firearms of the Treasury Department has investigative jurisdiction over bombings.

Hirtz then read four pages of the information handed him by Lawson, who told him that he was the person who had made the telephone calls to Dickey. When Hirtz finished reading, he signaled to Special Agent Cullen Scott to bring the briefcase containing the money. Lawson was shown the money; he then handed Hirtz the last page of the information. Lawson said that he saw a gun in Scott's belt. As Lawson stepped back and reached in his pocket, Ondrula shouted, "FBI," and dove for Lawson. In the ensuing scuffle Lawson fired a gun at Scott and missed. Hirtz and Ondrula were able to subdue Lawson. In addition to the .38-caliber handgun that was fired, the agents found another loaded .38 in Lawson's right coat pocket. Lawson waived his rights after arrest and admitted, among other things, that he was the one who had called Dickey.

The two-count indictment was filed on March 5, 1980. Lawson was found to be indigent, and the court appointed counsel to represent him. Lawson defended on grounds of insanity. After a two-day trial, the jury found him guilty on both counts. Lawson was sentenced to twelve years on the extortion count and eight years concurrently on the assault charge. Both sentences were suspended, however, and reduced to 180 days in confinement and five years on probation. He was released on this sentence two weeks later.

## II

Lawson's principal contention is that the admission of hearsay in the testimony of the Government's expert psychiatrist violated his right to confront adverse witnesses. During the pretrial proceedings, Lawson was examined for three months at the Federal Medical Center in Springfield, Missouri.[4] Dr. Robert B. Sheldon, chief of psychiatry at the Center, testified on the Government's behalf at trial that Lawson evidenced no symptoms of mental illness and that he was aware his conduct during

the extortion attempt was not in conformance with the law. Dr. Sheldon admitted, however, that he did not have much contact with Lawson while he was at Springfield. He never interviewed Lawson privately, although he occasionally spoke with him informally, and he participated in only two staff interviews at which Lawson was present.[5] Dr. Sheldon testified that two other physicians spent several hours each with Lawson in private interviews and that other members of the staff observed him during his stay. Dr. Sheldon thus based his testimony on reports he received from these physicians and other staff. He also stated that he relied on the results of tests administered at the Center, information received from the United States Marine Corps (of which Lawson had been a member), reports from the FBI, and "a large amount of information" furnished by the United States Attorney's Office. None of this information was ever introduced into evidence.

Lawson's trial attorney objected in a timely manner that Dr. Sheldon's opinion testimony was without foundation since "he would be placing the opinions of other persons not qualified [as an expert] and not before the Court [or] the jury." The district court overruled the objection and permitted Dr. Sheldon to state his opinion. Lawson now relies on *United States v. Bohle*, 445 F.2d 54, 69 (7th Cir. 1971), which held that a medical expert may not testify regarding his opinion if it is based on information obtained out of court from third persons, since such an opinion would depend upon hearsay. We agree with Lawson that the introduction of expert testimony based in large part on hearsay may raise serious constitutional problems if there is no adequate opportunity to cross-examine the witness. Under the circumstances in this case, however, Lawson had that opportunity, and his right to confront adverse witnesses was not violated.

The adoption of the Federal Rules of Evidence in 1975 expanded the scope of

---

4. He was examined pursuant to 18 U.S.C. § 4244.

5. Seven or eight staff members were present at each interview, which lasted approximately fifteen minutes each.

expert testimony. Rule 703 expressly permits experts to base their testimony on evidence that would otherwise be inadmissible, so long as it is "of a type reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject."[6] In *Baumholser v. Amax Coal Co.*, 630 F.2d 550 (7th Cir. 1980), this court held that testimony of an expert geologist concerning a study he had conducted of structural damage to homes caused by blasting in defendant's coal mine was properly admitted under Rule 703. Because a similar study had been conducted by the Atomic Energy Commission, the court found that the expert's survey "more than satisfied the threshold inquiry as to whether other experts would rely on it." *Id.* at 553. In this case, the information Dr. Sheldon relied on to reach his opinion—staff reports, interviews with other physicians, and background information from the Marine Corps and the United States Attorney's Office—were clearly of the type that psychiatrists would rely upon in making a similar professional judgment.[7]

■ In criminal cases, a court's inquiry under Rule 703 must go beyond finding that hearsay relied on by an expert meets these standards. An expert's testimony that was based entirely on hearsay reports, while it might satisfy Rule 703, would nevertheless violate a defendant's constitutional right to confront adverse witnesses.[8] The Government could not, for example, simply produce a witness who did nothing but summarize out-of-court statements made by others.[9] A criminal defendant is guaranteed the right to an effective cross-examination. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

■ In addition to the reasonable reliance requirement of Rule 703, a criminal defendant must therefore also have access to the hearsay information relied upon by an expert witness. Without such access, effective cross-examination would be impossible. Rule 705, which provides that an expert need not disclose the facts or data underlying his opinion prior to his testimony unless the court orders otherwise, recognizes this requirement.[10] The Advisory Committee notes to that rule state that it "assumes that the cross-examiner has the advance knowledge which is essential for effective cross-examination."

The record in this case indicates that Lawson had sufficient access to the information Dr. Sheldon used to reach his opinion. The reports from the FBI and the United States Attorney's Office were pro-

---

6. The text of Rule 703 reads in full:

  The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinion or inferences upon the subject, the facts or data need not be admissible in evidence.

7. Lawson points out quite correctly that Dr. Sheldon never testified, and the district court never found, that this information was of the type reasonably relied upon by psychiatrists. The court must make such a finding in order to satisfy the requirements of Rule 703. *United States v. Hollman*, 541 F.2d 196, 201 (9th Cir. 1976); *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980). We may take judicial notice, however, that psychiatrists customarily use such information to make a diagnosis. *See* Notes of Advisory Committee to Rule 703. The district court's error, under the circumstances in this case, is harmless.

8. *See, e. g., Weinstein's Evidence*, ¶ 703[03] at p. 703–18 (1980) ("In a criminal case, even though Rule 703 warrants the use of hearsay as a basis for an opinion, the constitutional right of confrontation may require that the defendant have the opportunity to cross-examine the persons who prepared the underlying data on which the expert relies.")

9. *United States v. Williams*, 431 F.2d 1168, 1173 (5th Cir. 1970), *aff'd en banc*, 447 F.2d 1285 (5th Cir. 1971), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972).

10. Rule 705 provides in full:

  The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

vided pursuant to a standard *Brady* request,[11] as were the final medical report from the Springfield Medical Center by Dr. Sheldon and the report of one of the psychiatrists who interviewed him privately. It is true that Lawson's counsel did not have copies of the notes made by staff members at the Center that were placed in Lawson's file and were reviewed by Dr. Sheldon, but since he did have most of the data Dr. Sheldon relied on, he had an adequate opportunity to prepare his cross-examination. Furthermore, Dr. Sheldon had had at least *some* contact with Lawson himself, even though he never interviewed him in private. Under these circumstances, we hold that Dr. Sheldon's testimony did not violate Lawson's right to confront adverse witnesses.[12]

### III

Lawson contends also that lay testimony on the issue of sanity was improperly admitted. Three FBI agents, including Hirtz, testified over objection that they believed Lawson was sane at the time of the commission of the offenses. There is no question that the Government (or the defense, for that matter) may introduce lay testimony on the issue of sanity. Rule 701 of the Federal Rules of Evidence expressly permits opinion testimony by lay witnesses.[13] Although the Government here presented Dr. Sheldon as an expert witness, it may, in rebutting an insanity defense, present only lay testimony. *United States v. Kennedy*, 578 F.2d 196 (7th Cir. 1978). Lawson's only argument is that in this case

the Government did not lay the proper foundation because the three agents did not observe him for a long enough period of time.

To support this contention, Lawson cites only cases that were decided before the Federal Rules of Evidence became effective. These cases hold that while a lay witness may testify about the conduct, assertions, appearance, and manner of speech of the defendant, they may only state an opinion on an ultimate issue such as sanity when "the witness has been qualified by sufficient association with an opportunity to observe the subject." *United States v. Alden*, 476 F.2d 378, 385 (7th Cir. 1973).[14] The adoption of the Federal Rules, however, modified this requirement. The rules permit the introduction of substantially more evidence than was formerly admissible. They place great reliance on cross-examination, for much evidence is now admissible subject to cross-examination as a means of verification. It is then up to the fact finder to determine the weight to be attached to that evidence.[15] No more foundation was necessary in this case to admit the opinion testimony of the FBI agents. On cross-examination of each of them, defense counsel pointed out that each had had the opportunity to observe Lawson on only one occasion. The jury was free to give that testimony, particularly in light of the expert testimony that was also heard, whatever weight it felt appropriate.

### IV

Lawson finally argues that the district court improperly denied his motion for

11. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

12. While *United States v. Bohle*, 445 F.2d 54 (7th Cir. 1971), is distinguishable on its facts from the present case, *Bohle* was written prior to the adoption of the Federal Rules of Evidence. To the extent, if any, it conflicts with this opinion, it is overruled. This opinion has been circulated to all the active judges of the court, and no judge voted that the matter of overruling be reheard *en banc*.

13. Rule 701, Fed.R.Evid., states:
   If the witness is not testifying as an expert, his testimony in the form of opinions or inference is limited to those opinions or inferences

which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

14. *See also United States v. Pickett*, 470 F.2d 1255, 1258 (D.C.Cir.1972); *Mason v. United States*, 402 F.2d 732, 738 (8th Cir. 1968).

15. Even in *United States v. Alden*, 476 F.2d 378 (7th Cir. 1973), cited by the defendant, the court held that brevity of observation would not affect admissibility but rather only the weight of the evidence. *Id.* at 385.

a court-appointed psychiatrist. In fact, however, Lawson was able to present a psychiatrist to testify as an expert on his behalf. Dr. Eric Ritterhoff testified that he had interviewed Lawson on two occasions and that he had had access to the reports from the Springfield Medical Center. Based on these observations, Dr. Ritterhoff stated that Lawson was suffering from a "manic depressive" mental illness that impaired his ability to conform his conduct to the law.

The record indicates that the Government paid for at least one of these interviews. Lawson now contends that if the district court had granted the funding, Dr. Ritterhoff would have had more opportunities to examine Lawson and would have been able to testify more precisely about Lawson's insanity. Such hypothetical statements as to what might have been are not sufficient to warrant a reversal, particularly since Dr. Ritterhoff was in fact able to testify on Lawson's behalf.

█ Lawson's motion for a court-appointed psychiatrist was heard on June 18, 1980, as one of many motions presented by the defense. The Government attorney left the room while this motion was heard, as required by statute.[16] Before leaving, however, the attorney discussed the issue with the court and informed the court that Lawson had been able to post a $25,000 surety bond. Lawson argues that the statement amounted to illegal participation in the *ex parte* hearing. While we do not condone such interference by the Government, we cannot hold in this case that it amounts to reversible error. At the time of the hearing, Lawson had already undergone the extensive testing at the Springfield Medical Center, and he had already seen Dr. Ritterhoff once. Based on these facts, the district court was within its discretion in deciding that no more psychological testing was necessary.[17]

Defendant's conviction is affirmed.

16. 18 U.S.C. § 3006A(e)(1).

17. *See United States v. Lincoln*, 542 F.2d 746, 749 (8th Cir. 1976), *cert. denied*, 429 U.S. 1106, 97 S.Ct. 1138, 51 L.Ed.2d 558 (1976) (in determining the reasonableness of the defendant's request for psychiatric services, the court may consider the results of other competency examinations).