**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Clinton BRAMLET, Defendant-Appellant.**

**Nos. 86–1222, 86–1235.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1986.

Decided May 13, 1987.

As Amended July 17, 1987.

Joshua Sachs, Chicago, Ill., for defendant-appellant.

Laura J. Jones, Asst. U.S. Atty., and Frederick J. Hess, U.S. Atty., Benton, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS and FLAUM, Circuit Judges.

BAUER, Chief Judge.

On December 2, 1983 at approximately 6:00 p.m., Clinton Bramlet, clad in olive-colored fatigues, a dark parka and a ski mask, entered Community Trust Bank in Irvington, Illinois. Armed with a machine gun and a radio to monitor police activities, he demanded and escaped with bank funds totaling $34,293.50. Roger Walker, an Illinois State Trooper and the only peace officer in this sleepy little community, responded to an emergency call to his home only to discover that the rear tires of his squad car had been slashed.[1]

Again, on March 30, 1984, at 7:00 p.m., another small town bank fell victim to mischief. The Bartelso Savings Bank in Bartelso, Illinois was robbed by a man wearing a ski mask with protruding radio antenna and wielding a large machine gun. The robber made off with $20,000. This time, Illinois State Trooper David L. Gross attempted to respond to a call for help, only to discover that his car's tires were slashed and its mobile receiver antenna cut.

Clinton Bramlet was tried and convicted for each of these bank robberies, as well as several related weapons offenses. Bramlet appeals his conviction charging: (1) that the government failed to prove his sanity beyond a reasonable doubt; (2) that the district court's order striking the entire testimony of a government rebuttal witness was inadequate to cure certain prejudice to the defendant; (3) that the district court improperly permitted a government expert to testify as to his opinion based on the observations of hospital staff; and (4) that the district court improperly admitted evidence of prior offenses where it was not established by clear and convincing evidence that the defendant had committed them.

Additionally, in an unrelated case, Bramlet pled guilty to four counts of mail fraud in violation of 18 U.S.C. § 1341. He was sentenced to a five year prison term on each count, to run consecutive to one another and consecutive to the sentence imposed for his bank robbery convictions. Bramlet contests the imposition of consecutive terms for each count of mail fraud as an abuse of discretion by the district court.

At trial, the government predicated its case on the testimony of Jesse Stoneking, a government informant. Stoneking became

---

1. As described by my law clerks—members of the T.V. generation—the situation is one reminiscent of some television programs involving one Deputy Fife. I am informed that such things happen to Deputy Fife with heart-sinking regularity and while he kicks at his useless tires one Aunt Bee looks on worriedly. (No Aunt Bee is cast in the present opus.)

acquainted with the Appellant through a series of illicit meetings during which Bramlet offered to sell unregistered hand grenades and a 30 caliber machine gun. During these meetings, the Appellant elaborated extensively on robbing banks. Specifically, Stoneking testified that the Appellant admitted robbing the banks in Bartelso and Irvington. Moreover, Stoneking was allowed to testify that the Appellant claimed to have robbed banks in Godfrey, Bunker Hill, and Lebanon, Illinois, including specific details of each offense. In addition, tape recordings of those conversations were introduced into evidence. Special Agent Dale Schuler of the FBI testified that each detail regarding the Godfrey, Bunker Hill and Lebanon robberies described by the Appellant was accurate. Schuler further testified that all of these robberies occurred prior to 1976 and had not been solved. The government also introduced various articles of physical evidence indicating the Appellant's participation in the charged crimes.

Bramlet's sole defense below was one of insanity. He introduced evidence of a severe beating he suffered in 1976 which allegedly resulted in organic brain damage rendering him mentally incapable of forming the intent necessary to commit the charged offenses. The Appellant was attacked during a labor dispute by eight to ten men, two of whom knocked Bramlet off a tractor which he was operating and proceeded to kick and beat him repeatedly. As a result of this attack, Bramlet suffered a broken jaw, the loss of several teeth, a fractured nose, and a blowout of his left orbit, the bony cavity of the skull which holds the eye.

In support of his insanity defense, Bramlet introduced six lay witnesses who described a series of personality changes which he allegedly suffered as a result of his injuries. Each witness testified to a sharp deterioration in the Appellant's attitude regarding his work, family, personal hygiene, and general societal temperament, as well as hostile and deviant conduct. In addition, Bramlet called Dr. Leo Theodoro and Dr. David Schreiber, M.D., two expert medical witnesses who testified that he suffered from an organic syndrome associated with trauma to the frontal lobe of his brain. Each defense expert examined Bramlet personally and reviewed his medical records and personal history. In the expert opinion of both witnesses, the Appellant's brain damage caused a diminished capacity for judging and conforming his conduct to the requirements of the law. The witnesses refuted the notion that Bramlet could have falsified his condition during clinical observations and also indicated that the sophistication of the offenses committed was not inconsistent with his disease.

The government offered the testimony of three expert witnesses to rebut the Appellant's insanity defense. Prior to trial, the district court entered a general order excluding all witnesses from hearing the testimony of others. Dr. Christina Echols, a highly qualified psychologist, gave extensive testimony regarding a battery of evaluative studies which she performed on the Appellant. She concluded that Bramlet was not suffering from any brain defect, but had attempted to fake the symptoms of such a disease during observation and in response to evaluative testing. However, shortly into cross-examination, Dr. Echols revealed that she had read the prior testimony of the Appellant's witnesses in contravention of the court's exclusionary order. When the trial judge requested suggestions to remedy this violation, Appellant's counsel explicitly indicated that he was opposed to a mistrial. However, the court did strike Dr. Echols' testimony in its entirety and instructed the jury to disregard it.

The government called a second rebuttal witness, Dr. Karl Albaeck, a 73 year-old neurosurgeon specializing in back surgery. Dr. Albaeck ordered a CAT scan, skull x-rays, and EEG testing for Bramlet, and performed a cursory neurological examination himself. Dr. Albaeck testified that Bramlet's EEG, CAT scan, and skull x-rays were normal. However, Dr. Albaeck had not performed any of these tests himself and did not make the determination that the results were normal. Instead, he relied

on the conclusions of those specialists who performed the various examinations. Dr. Albaeck concluded that the Appellant was not suffering from an organic brain defect.

Dr. James Leach, a forensic psychologist, also testified that in his expert opinion Bramlet was not suffering from organic brain damage. Dr. Leach testified that the Appellant was a malingerer who "voluntarily produced and presented a false or grossly exaggerated physical or psychological symptom." The doctor relied upon the psychological tests performed by Dr. Echols, the sophistication of Bramlet's offenses, and the Appellant's behavior observed on the hospital ward by various staff members, including correctional officers, all of whom were trained in patient observation.

## I.

■ Despite the jury's finding to the contrary, the Appellant contends that the government failed in its burden to establish his sanity beyond a reasonable doubt. Though the Comprehensive Crime Control Act of 1984 significantly altered the allocation of burdens in an insanity defense case,[2] the law which prevailed at the time of this action dictates that once a defendant raises a *prima facie* defense of insanity, the government must establish that he is sane beyond a reasonable doubt. *Burks v. United States*, 437 U.S. 1, 3, 98 S.Ct. 2141, 2143, 57 L.Ed.2d 1 (1978); *Lynch v. Overholser*, 369 U.S. 705, 713, 82 S.Ct. 1063, 1068, 8 L.Ed.2d 211 (1962); *United States v. Bodey*, 607 F.2d 265, 268 (9th Cir.1979); *United States v. Sennett*, 505 F.2d 774, 778 (7th Cir.1974). However, before this court may disturb the jury's determination, the Appellant must establish that "reasonable persons hearing the evidence could not have concluded beyond a reasonable doubt that he was sane." *United States v. Kennedy*, 578 F.2d 196, 198 (7th Cir.1978) (citing *United States v. Greene*, 497 F.2d 1068, 1072–1073 (7th Cir.1974)). Moreover, we must view all the evidence in the light most favorable to the government

when considering a challenge to a jury verdict. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Burks*, 437 U.S. at 4, 98 S.Ct. at 2143; *Kennedy*, 578 F.2d at 198.

To state these propositions is tantamount to a foreclosure of the Appellant's challenge here. Both the government and the Appellant introduced conflicting expert testimony regarding his sanity. While their methods of analysis differed and their credentials varied, nothing cited by the Appellant renders the testimony of the government's witnesses incredible as a matter of law. Each of the government's doctors personally examined Bramlet and relied on the results of objective physical or psychological tests in concluding that he did not, in fact, suffer from a brain disorder which rendered him incapable of conforming his conduct to the requirement of the law. Thus, the jury could have properly credited the testimony of the government's witnesses, while discounting that of the Appellant's experts. *Kennedy*, 578 F.2d 2 at 198. In addition, the jury was entitled to discount the lay testimony of Bramlet's friends and relatives as biased by a motivation to assist him. *Greene*, 497 F.2d at 1073.

The most compelling indication of the Appellant's sanity, however, was evidence of his participation in numerous bank robberies prior to the infliction of his injuries in 1976. Bramlet contends that as a result of a severe beating he was rendered incapable of conforming his conduct to the requirements of the law which ultimately led to the commission of the charged offenses. A reasonable jury could have properly concluded that Bramlet either did not suffer from an organic brain disorder, of if he did, it did not render him incapable of conforming his conduct to the requirements of the law, where he committed identical illegal acts both before and after the onset of his alleged insanity. Viewed in a light most favorable to the government, *see Jackson,*

2. Though not applicable here, we note that the comprehensive crime control act of 1984 significantly alters the allocation of the burdens of proof by requiring that the defendant prove, by

clear and convincing evidence, that a severe mental disease or defect resulted in his inability to appreciate the nature and quality or the wrongfulness of his acts. 18 U.S.C. § 20 (1984).

443 U.S. at 319, 99 S.Ct. at 2789, the evidence presented below clearly supports the jury's verdict that Bramlet was legally sane beyond a reasonable doubt.

## II.

■ The Appellant also maintains that the district court committed numerous errors which warrant a new trial. Despite his specific request that a mistrial not be declared when it was initially learned that the district court's exclusionary order had been violated, Bramlet now argues that the court committed reversible error in not granting his subsequent motion for a new trial. It was only after the jury returned a verdict of guilty that Bramlet even moved for a new trial. The Appellant complains that an "accident of procedure [violation of the court's order] permanently insulated this [Dr. Echols'] devastating testimony from cross-examination." Yet at the time of trial he made no request for additional cross-examination. When explicitly asked for suggestions to remedy the allegedly erroneously admitted evidence, the Appellant merely requested that Dr. Echols' testimony be stricken and nothing more. The Appellant's cry of "foul" only after an unfavorable judgment, smacks of duplicity at worst and an attempt to rescue an unsuccessful trial strategy at best.

More significantly, however, application of the court's general exclusionary order to the government's rebuttal witnesses was unnecessary. The rationale for excluding adverse witnesses is premised on the concern that once having heard the testimony of others, a witness may inappropriately tailor his or her own testimony to the prior evidence. *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976); *United States v. Ell*, 718 F.2d 291, 293 (9th Cir.1983). This concern is justified, for instance, where "fact" or "occurrence" witnesses are called to testify. Under such circumstance, a fact finder's appreciation for and determination of relevant facts and occurrences must remain unsullied by the potential for subtle, yet significantly distorted modification of a witness testimony.

By contrast, the very function of a rebuttal witness is directed toward challenging the prior testimony of opposing witnesses, thereby enhancing the fact finder's ultimate determination of an objective "truth." While not all rebuttal witnesses need be apprised of prior testimony—impeachment witnesses called to demonstrate bias, for example,—a rebuttal witness presented to refute the medical findings of an opposing expert can contribute most completely to a jury's truth finding capacity only by fully understanding and addressing all of the relevant prior evidence. *Cf. United States v. Burgess*, 691 F.2d 1146, 1157 (4th Cir. 1982) (holding that government psychiatrists should be allowed to hear testimony of opposing expert witnesses in order to completely familiarize themselves with each other's findings). Whether such evidence is summarized in the form of a hypothetical question or exposed by prior review, rebuttal examination cannot be properly conducted without revealing, in some measure, the testimony which is subject to refutation. Moreover, trial by ambush and confoundment of rebuttal witnesses hardly advances the purported goals of reliability and trustworthiness. *Id.* (it is unreasonable to place experts under short time constraints for familiarizing themselves with each other's findings and therefore, reasonable to permit all of them to appear in court).

In addition, though not relevant here, practical considerations militate against excluding rebuttal witnesses. It is often difficult to know in advance who may be called to rebut evidence which has not yet been presented. Thus, any number of interested persons attending a trial might be called as rebuttal witnesses, making their prior exclusion impossible.[3]

## III.

■ The Appellant also challenges the admissibility of Dr. Leach's opinion that

---

**3.** Though it is unclear what prompted the United States Attorney to give trial transcripts to its expert witnesses, we do not mean to condone, in any way, the intentional or even careless violation of a trial court's explicit order regardless of its subsequent reversal.

Bramlet was a malingerer attempting to falsify his alleged insanity, where that opinion was based, in part, on the recorded observations of hospital staff members whom the government did not call to testify. Over objection, Dr. Leach was allowed to summarize and draw conclusions from notes and reports of MCFP (Medical Center for Federal Prisoners) staff members, who included "correctional officers," "correctional counselors" and nurses, regarding the Appellant's behavior when he was not subject to manifest observations by a physician. Dr. Leach testified that Bramlet's conduct during medical interviews contrasted sharply with the observations of MCFP staff members, thus contributing to the doctor's opinion that Bramlet was in fact a malingerer.

Bramlet contends that the trial court erred in permitting the use of these MCFP reports because they constitute hearsay for which there exists no exception for admission under the Federal Rules of Evidence. We do not agree. Despite the Appellant's attempt to distinguish this court's opinion in *United States v. Lawson*, 653 F.2d 299 (7th Cir.1981), we find that case to be controlling authority on this issue. In *Lawson* we held that a government expert could predicate his opinion regarding the defendant's sanity, in part, on the recorded observations of MCFP staff members pursuant to Federal Rule of Evidence 703. As in the present case, the *Lawson* defendant was ordered to undergo psychiatric evaluations at the MCFP pursuant to 18 U.S.C. § 4244. *Id.* at 301. Though the testifying physician never interviewed the defendant privately, he was permitted to give his opinion as to the defendant's sanity relying, *inter alia,* on reports he received from other physicians and MCFP staff members. *Id.* Despite the defendant's argument that the doctor's opinion testimony was without foundation since "he would be placing the opinions of other persons, not qualified [as experts] and not before the court [or] the

jury" into evidence, this court concluded that MCFP staff reports "were clearly of the type that psychiatrists would rely upon in making a similar professional judgment" and thus satisfied the requirements of Rule 703. *Id.* at 301–302.

We agree with the *Lawson* court that observations recorded by trained, though admittedly not expert staff personnel, are exactly the type of information which the broadened scope of Rule 703 was intended to encompass. *See* Fed.R.Evid. 703 Advisory Committee's Note ("[A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospitals records, and x-rays ... his [the expert's] validation expertly performed and subject to cross-examinations, ought to suffice for judicial purposes.") Thus, Dr. Leach was properly allowed to premise his conclusions on his own examination of the Appellant augmented by MCFP staff reports.

## IV.

■ Pursuant to Federal Rule of Evidence 404(b), the district court admitted evidence of the Appellant's alleged commission of other uncharged crimes as proof to rebut his insanity defense.[4] The government adduced evidence of Bramlet's participation in several unresolved bank robberies, committed prior to the alleged onset of his insanity in 1976. Specifically, the government introduced a tape recording in which Bramlet boasted to Jesse Stoneking that he had robbed banks in Godfrey, Lebanon and Bunker Hill, Illinois, including specific details of each offense. FBI Agent Schuler corroborated the details of Bramlet's accounts and testified that each of the offenses remained unsolved. Essentially, Bramlet argues that the district court abused its discretion in finding that the

4. Fed.R.Evid. Rule 404(b) states:
(b) Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Fed.R.Evid. 404(b).

government's proof was sufficient to establish his participation in the uncharged crimes by clear and convincing evidence.[5]

Because such "other crimes" evidence engenders an inherent potential for confusion and prejudice against a criminal defendant, *see United States v. Beasley,* 809 F.2d 1273, 1279 (7th Cir.1987), this circuit as well as others, has limited its use by requiring, *inter alia,*[6] that the defendant's participation in the extrinsic conduct be established by clear and convincing evidence. *United States v. Draiman,* 784 F.2d 248, 254 (7th Cir.1986); *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir. 1984); *see also United States v. Shelton,* 628 F.2d 54, 56 (D.C.Cir.1980); *Hill v. Henderson,* 529 F.2d 397, 400 (5th Cir. 1976). However, a district court's determination that the clear and convincing standard has been met is entitled to great deference and will not be disturbed on appeal unless an abuse of discretion is shown. *United States v. Rouetuso,* 768 F.2d 809, 815 (7th Cir.1985).

This court has stated that "[d]irect testimony of the defendant's participation in a prior crime ... is ordinarily held to satisfy the clear and convincing standard." *United States v. Dolliole,* 597 F.2d 102, 107 (7th Cir.) *cert. denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979). Certainly the Appellant's taped admission that he participated in the uncharged robberies suffices to meet this standard, particularly when bolstered by corroborative circumstantial evidence. Therefore, we cannot conclude that the trial judge abused his discretion in determining that this evidence was sufficiently clear and convincing to be submitted to the jury. *See United States v. Beasley,* 809 F.2d at 1278 ("Appellate courts can contribute only modestly to the

making of the best decision case by case ... Trial judges have a comparative advantage because they alone see all the evidence in context, and the judicial system as a whole takes advantage of the division of labor.")

## V.

Finally and very briefly, we address the Appellant's unsupported argument that the imposition of consecutive sentences for each count of mail fraud constitutes an abuse of discretion. The Appellant has cited no authority, and we are aware of none, to support his claim. We note, however, that the Supreme Court has indicated that a sentence imposed by a federal district court judge, if within statutory limits, is generally not subject to review, *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958), unless predicated upon misinformation or constitutionally impermissible considerations. *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). The Appellant cannot and does not contend that either of these prerequisites was prevalent here.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

5. The Appellant's arguments charging that admission of this evidence violated Fed.R.Evid. 403 (probative value substantially outweighed by unfair prejudice) is premised on his argument that the trial court erred in its determination that his participation in the prior acts was clear and convincing; therefore it need not be addressed independently.

6. This court has listed four requirements which must be met before other crimes evidence can be admitted. The evidence must be (1) directed toward establishing a matter in issue other than the propensity of the defendant to commit the crime charged, (2) of an act similar enough, and close enough in time, to be relevant to the matter in issue, (3) clear and convincing and (4) of a probative value not substantially outweighed by the danger of unfair prejudice. *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984).