898 F.2d 155
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mary Louise Carter JOHNSON, Defendant-Appellant.
 No. 89-5609.
 United States Court of Appeals, Sixth Circuit.
 March 5, 1990.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and FRANK J. BATTISTI, District Judge.*
 PER CURIAM.
 
 
 1
 Defendant Mary Louise Carter Johnson appeals her conviction and sentence on six counts relating to the distribution of a controlled substance called Dilaudid. She argues that (1) the evidence was insufficient to support the jury verdict, (2) the district court improperly allowed witnesses to testify about her alleged co-conspirator's statements, (3) testimony (on cross-examination) by two prosecution witnesses that the defendant had shot her husband was grounds for a mistrial, (4) a defense witness's presence in the courtroom was not proper grounds for the exclusion of her testimony, (5) testimony as to the defendant's non-filing of federal income tax returns was improperly admitted, and (6) the district court did not properly consider relevant conduct in its application of the sentencing guidelines. Concluding that the defendant's challenges to her conviction are without merit and that any error at the sentencing stage was harmless, we shall affirm the conviction and sentence.
 
 
 2
 * This case arises from the long-term and large-scale distribution of Dilauded by the defendant and her mother, Ocie Bell Carter, in Jackson, Tennessee. The defendant was charged with one count of conspiring with her mother to possess Dilaudid with intent to distribute it within 1000 feet of a public secondary school, in violation of 21 U.S.C. Secs. 841(a)(1), 845a, 846; two counts of distributing Dilaudid, in violation of Sec. 841(a); and three counts of distributing Dilaudid within 1000 feet of a public secondary school, in violation of 21 U.S.C. Secs. 841(a)(1), 845a. She was convicted after a jury trial on all six counts.[1] She was sentenced concurrently to 222 months (18 years, 6 months) on the first count and the last three, and to 15 years on the other two counts.
 
 
 3
 One Jerry Wayne Price testified he supplied Ms. Johnson with Dilaudid from 1983 to 1987. Mr. Price met her at various locations on Interstate 40, where he sold her quantities of Dilaudid ranging from 30 pills to 100 pills. The price ranged from $30 to $33 per pill. On occasion he would meet her two to three times a day. Ms. Johnson would contact him by beeper and Price would call her back and arrange a meeting.
 
 
 4
 A user named Frances Nehring testified that she had taken approximately five Dilaudid pills per day and that from 1984 to 1986, Ms. Johnson was her source. She paid $55 apiece for the pills and wrote forged checks to support her habit. On a couple of occasions Ms. Nehring personally purchased Dilaudid from the defendant, and Ms. Nehring's boyfriend made the purchases for her the rest of the time. Ms. Nehring once purchased drugs from Ms. Johnson's mother, Ms. Carter. Ms. Nehring also testified that over the time she was buying Dilaudid from the defendant, the defendant's house was transformed from a "shack" into a "nice house."
 
 
 5
 Another user, Donald Chandler, testified that he first became involved with illegal drugs at age 16 or 17 and with Dilaudid at age 22 or 23. He was 25 years old at the time of the trial. Mr. Chandler was serving a sentence for 39 counts of forgery, four counts of burglary, and four counts of petty larceny, and he had numerous other felony convictions. From 1984 to 1986, defendant Johnson was one of his sources for Dilaudid. He also purchased Dilaudid from an older woman--presumably Ms. Carter--at Ms. Johnson's house. He paid $55 apiece for the Dilaudid pills, purchasing as many as six per day.
 
 
 6
 Vickie Cobb, another Dilaudid addict, testified that she used the drug from 1985 to September 1986, when she went to the penitentiary for forging checks to obtain it. During the period of time she used Dilaudid, she purchased it from the defendant, from Ms. Carter, and from the defendant's sister, Mattie Carter Cockrell. The purchases were all made at the defendant's house. Ms. Cobb too paid $55 per pill.
 
 
 7
 Barbara Darling testified that she purchased Dilaudids from the defendant between March of 1985 and September 1985. The defendant's mother was present while a number of these purchases were made. Ms. Darling bought three pills per week at $55 per pill.
 
 
 8
 Ann Perdue testified that she purchased Dilaudid from both the defendant and her mother at defendant's residence on Royal Alley. She paid $50 to $60 per pill, making purchases once or twice per day for eight to nine months. Later she testified that she purchased one to three pills, four or five days a week. She admitted to convictions on 17 counts of writing bad checks to support her drug habit.
 
 
 9
 Eula Hall testified that she purchased Dilaudid from the defendant every day for over a year, paying $50 to $55 apiece. On August 23 and 29, 1984, she purchased a pill from defendant under controlled circumstances set up by the Police Department of Jackson, Tennessee. A police officer also testified about these controlled buys, which were the subject of counts 2 and 3 of the indictment.
 
 
 10
 Lisa Wyatt testified that she used Dilaudid from 1984 to 1988, buying it from Ms. Johnson and Ms. Carter. During this period the defendant's home was remodeled from a "shack" into a "big, beautiful home." Ms. Wyatt paid $55 per tablet and bought every day. She was arrested on November 16, 1987, and a Dilaudid that she had bought from the defendant was found on her person. This sale was charged in count 4 of the indictment.
 
 
 11
 Rickey Wyatt, Lisa Wyatt's ex-husband, testified that he started using Dilaudid in 1984. He stopped in December of 1987. At his worst, Mr. Wyatt said he was using ten Dilaudids per day. He paid the defendant $55 apiece for the pills. Mr. Wyatt conservatively estimated he spent $35,000 to purchase Dilaudid. He also traded marijuana and food stamps with Ms. Johnson in exchange for the drug.
 
 
 12
 Mr. Wyatt made controlled purchases of Dilaudid on December 16 and 22, 1987. On December 16 he bought one pill from the defendant for $55. On December 22, he went to the defendant's house, and she took him to a nearby house where he purchased a pill from an unidentified person. Ms. Johnson vouched for Mr. Wyatt to this person. These sales were charged in counts 5 and 6 of the indictment.
 
 
 13
 Sergeant Rocky Acuff of the Jackson Police Department measured the distance between Jackson Central Merry High School and the defendant's house at 121 Royal Alley, where the controlled buys related in counts 4 and 5 took place. The distance between the property lines was approximately 120 feet. He measured the distance from the property line of the football field of the high school to the house on Preston Alley where the controlled buy related in count 6 took place, and he found the distance to be approximately 304 feet.
 
 II
 
 14
 * The defendant argues that the evidence was not sufficient to convict her because most of the government's witnesses were felons and drug addicts, and no rational jury could believe their testimony.
 
 
 15
 Questions of credibility are for the jury to decide. Henderson v. United States, 202 F.2d 400 (6th Cir.), reh'g denied, 204 F.2d 126 (6th Cir.1953). If the jury believed the government's witnesses, the evidence of Ms. Johnson's crimes was not merely sufficient, it was overwhelming. A rational trier of fact could easily have found the elements of the charged crimes beyond a reasonable doubt.
 
 B
 
 16
 The defendant contends that the court erred in finding the government had proved the existence of a conspiracy by a preponderance of the evidence, and that two hearsay statements of Ms. Carter, her alleged co-conspirator, thus ought to have been ruled inadmissible. It is claimed that the court ought to have granted a mistrial for this reason at the end of the government's case in chief.
 
 
 17
 Under Fed.R.Evid. 801(d)(2)(E), statements by a co-conspirator are not hearsay if made during the course and in furtherance of the conspiracy. In United States v. Enright, 579 F.2d 980 (6th Cir.1978), this court set forth certain guidelines for administering the co-conspirator exception to the hearsay rule, holding that before the government could take advantage of the exception, it had to show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy. The court in this case chose to admit the hearsay statements subject to later demonstration of whether the government had proven the conspiracy by a preponderance of the evidence. See United States v. Vinson, 606 F.2d 149, 153 (6th Cir.1979), cert. denied, 445 U.S. 904 and 444 U.S. 1074 (1980).
 
 
 18
 As noted above, the evidence against the defendant is overwhelming. The testimony shows that when the defendant was not at home, her mother would sell Dilaudid to the defendant's regular customers. Frances Nehring, Vickie Cobb, Eula Hall, Barbara Darling, Lisa Wyatt, and Ann Perdue all testified that they bought Dilaudid from both the defendant and her mother at 121 Royal Alley. A tape was introduced through Lisa Wyatt in which Ms. Carter tells her that defendant had "them" all with her and that she would be back later. Both comments by Ms. Carter were made in the course of and in furtherance of the conspiracy; they provided prospective drug purchasers with information either about a drug sale or the conditions under which a drug sale would be made. The Enright requirements were satisfied, and there was no error.
 
 C
 
 19
 On cross-examination, two government witnesses mentioned that the defendant had shot her husband. With Lisa Wyatt on the stand, the following exchange took place:
 
 
 20
 "BY MR. BROWN [Defense Counsel]:
 
 
 21
 Q. Didn't you know--Didn't you feel in your soul, 'Lord, what am I getting ready to do to this poor person, going over there to deliberately lie about her?'
 
 
 22
 A. The reason I was scared when I went over there with a bug on me, if she would have caught me, by God, she probably would have shot me just like she did her husband.
 
 
 23
 MR. BROWN: Objection, Your Honor.
 
 
 24
 THE COURT: That's sustained. That's not responsive to the question.
 
 
 25
 Ladies and gentlemen, that's not in evidence and it's not relevant to the trial, and you'll not consider that.
 
 
 26
 THE WITNESS: I'm sorry."
 
 
 27
 When Ms. Wyatt's ex-husband, Rickey, took the stand, this exchange occurred:
 
 
 28
 "BY MR. BROWN:
 
 
 29
 Q. When did she find out you were wired?
 
 
 30
 A. I started to get in my truck, and she said, 'Rickey,' like this. That's when she knew--I knew she knew I was wired, and she wanted me to come in. I didn't know what would happen, because she shot her husband before--
 
 
 31
 MR. BROWN: Your Honor--
 
 
 32
 THE COURT: Ladies and gentlemen of the jury, you'll disregard that comment. There's no evidence of that in the record. That's not an issue in this case, and you'll disregard completely any reference to that.
 
 
 33
 MR. BROWN: May we approach the bench, Your Honor?
 
 
 34
 THE COURT: Yes, sir.
 
 
 35
 (Bench conference)
 
 
 36
 MR. BROWN: Both he and his wife did that. They threw it out gratuitously, and I may have to move for a mistrial on that. I don't know--
 
 
 37
 THE COURT: What's your position on that?
 
 MR. GODWIN [The Prosecutor]:
 
 38
 Well, is he making--He said 'may have to,' and to me, Your Honor--The position is it all came up on cross-examination, and I don't think--
 
 
 39
 THE COURT: Well, I don't have any indication that those witnesses were prompted to do that. Now, it does appear that two witnesses have gratuitously said that, but it may be because of the hostility generated in cross-examination. They wanted to somehow strike back.
 
 
 40
 But if you did move for a mistrial it would be denied on the basis that it's all come out on very thorough cross-examination. Many of the questions are open-ended and call for narrative responses, and so I think it's the type of questioning that leads them to have an opportunity to do that.
 
 
 41
 But, now, that's certainly an appropriate way to cross examine, but I'm not going to grant a mistrial on that basis, so it's denied."
 
 
 42
 The defendant cites United States v. Chase, 372 F.2d 453 (4th Cir.), cert. denied, 387 U.S. 913 and 387 U.S. 907 (1967), for the proposition that the court ought to have granted a mistrial. In Chase, the defendants were charged with illegal gambling. Somehow there got into the jury room a newspaper with a story naming Chase as a "veteran gambler" known as such by the Washington, D.C., police. It was read by all the jurors. On motion, the court declared a mistrial.
 
 
 43
 Whether to grant a mistrial is within the trial court's discretion. The court of appeals may reverse a denial of a mistrial motion only upon a showing of an abuse of discretion, and only if the abuse results in "serious prejudice" to the defendant. United States v. Atisha, 804 F.2d 920, 926-927 (6th Cir.1986), cert. denied, 479 U.S. 1067 (1987). This circuit has held it is not an abuse of discretion to deny a mistrial when a government witness testifies on cross-examination regarding other crimes committed by the defendant, if the trial court strikes the impermissible testimony and gives a clear and positive instruction to the jury to disregard it. United States v. Steele, 727 F.2d 580, 587-88 (6th Cir.), cert. denied, 467 U.S. 1209 (1984).
 
 
 44
 The present case is much closer to Steele than to Chase. The Chase jury read a seemingly authoritative news story linking the defendant to the crime with which he was charged. In the present case, as in Steele, there was impermissible testimony regarding an uncharged crime. Immediately following each of the incidents, the district court instructed the jury that such comments were not in evidence and that the jury was to disregard them. The defendant was not entitled to a mistrial.
 
 D
 
 45
 The defense attempted to call the defendant's sister, Mattie Carter Cockrell, who had been in the courtroom for most of the trial. A separation of witnesses had been ordered at the beginning of the trial in accordance with Fed.R.Evid. 615. Defense counsel asserted that he had not intended to call Ms. Cockrell, but that Vickie Cobb, testifying for the government, had identified her in the courtroom and said she had sold Dilaudid to Ms. Cobb. Much later in the trial, Rickey Wyatt testified on cross-examination that he bought one Dilaudid from Ms. Cockrell. After defense counsel asked Mr. Wyatt if Ms. Cockrell would be able to tell what Mr. Wyatt was doing at the defendant's house, there was a bench conference following which the court ordered Ms. Cockrell removed from the courtroom. Defense counsel made an offer of proof indicating that Ms. Cockrell would refute the statements of Ms. Cobb and Mr. Wyatt. The court ruled that because defense counsel did not remove Ms. Cockrell from the courtroom after Ms. Cobb's statement, Ms. Cockrell was in violation of Rule 615 and would not be permitted to testify.
 
 
 46
 Exclusion of a witness for a Rule 615 violation is reviewed for abuse of the trial court's discretion. United States v. Gibson, 675 F.2d 825, 835-36 (6th Cir.) (not abuse of discretion to exclude testimony of witness who violated Rule 615 with knowledge and consent of party, and where other witnesses testified to substantially same facts), cert. denied, 459 U.S. 972 (1982).
 
 
 47
 The defendant makes two arguments as to why Ms. Cockrell ought to have been permitted to testify. First, it is claimed that she was in the nature of a rebuttal witness. Relying on United States v. Bramlet, 820 F.2d 851 (7th Cir.), cert. denied, 484 U.S. 861 (1987), the defendant argues that to be effective, a rebuttal witness needs to hear the testimony she is to rebut. Bramlet, however, concerned a medical expert called to refute the testimony of the other side's expert. In the present case, Ms. Cockrell was a fact witness, not an expert. Once defense counsel knew he would be calling her, he should have removed her from the courtroom and/or obtained a ruling from the court.
 
 
 48
 The defendant's second argument is utterly without merit. She claims that Ms. Cockrell was "in the nature of an unindicted co-conspirator," and therefore she had a right to be in the courtroom.
 
 
 49
 There is no support in the law for the notion that someone "in the nature of a co-conspirator" has a right to be in the courtroom during the trial of another conspirator. Although there was evidence that would support a charge of conspiracy against her, Ms. Cockrell was not charged or named by the grand jury in any way. She would not have been harmed by exclusion from the courtroom.
 
 
 50
 Constitutional rights, moreover, are personal. See, e.g., United States v. Payner, 447 U.S. 727 (1980) (federal court should not exercise supervisory powers to exclude evidence illegally seized from third party); Hampton v. United States, 425 U.S. 484, 490 (1976) (plurality opinion) (limitations of Due Process Clause come into play only when government activity violates protected right of defendant). Counsel have not cited, and we have been unable to find, any cases dealing with third-party assertions of rights under the Confrontation Clause. This may be because the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI (emphasis supplied). On its face, the Sixth Amendment states only that the accused may assert the right; Ms. Cockrell was not the accused.
 
 
 51
 Although Ms. Cockrell was not permitted to testify, the defense was able to put on evidence to refute the charges. Joanne Gordon testified that she had never seen Rickey Wyatt at the defendant's home and had never seen Ms. Cockrell sell drugs. Elizabeth Shaw testified she was regularly at the defendant's home and had never seen Rickey Wyatt or Vickie Cobb there. Ms. Cockrell's denying that she sold drugs is irrelevant to defendant's case. The court did not abuse its discretion by not permitting her to testify.
 
 E
 
 52
 On rebuttal, the government presented the testimony of an Internal Revenue Service investigator to show that the defendant had not filed income tax returns from 1984 to 1987. Although this evidence tended to show that the defendant had no legitimate source of income, she contends that the probative value of the evidence was outweighed by its prejudicial effect, so it should have been excluded pursuant to Fed.R.Evid. 403.
 
 
 53
 Evidence of failure to file income tax returns is admissible to negate a defendant's claim of legitimate income. United States v. Vannerson, 786 F.2d 221, 224 (6th Cir.), cert. denied, 476 U.S. 1123 (1986). Before admitting the evidence in the instant case, the court instructed the jury that:
 
 
 54
 "this is not a tax case, that the defendant is not charged with a violation of any tax laws of the United States, so you will not consider any testimony about tax records or the absence thereof in any way as showing that the defendant may have violated the tax laws. This evidence is allowed to be introduced because there is authority that evidence of tax records, or lack thereof, may be relevant on the issue of income, where income came from. And it is not being admitted in any way to show that the defendant violated any tax laws. And you will not consider it as any evidence of any violation of any tax law. The defendant is not charged with that, and you can't consider that.
 
 
 55
 You can give this evidence whatever weight you choose to give it in deciding about the source of the defendant's income. You may conclude that it is probative on that issue, or you may conclude that it doesn't prove anything. That will be a decision for you to make."
 
 
 56
 The defendant argues that because she did not testify, she made no assertions concerning income from outside sources. This is incorrect. She produced five witnesses who testified that she had a legitimate source of income from ownership of a convenience store and from selling blue jeans as late as 1983. There was also extensive evidence of substantial purchases by the defendant and improvements to her real property in the years she did not file a return.
 
 
 57
 We are in no position to say that the district court struck the wrong balance under Rule 403, especially when it gave so strong a cautionary instruction. And even if there had been an error in this respect, the other overwhelming evidence of defendant's guilt would have rendered any such error harmless.
 
 F
 
 58
 The defendant argues the district court erred in computing the offense level for the first count and last three counts, all four of which counts came under the sentencing guidelines. (The other two counts did not.) The court made the following findings:
 
 
 59
 "Based upon the testimony of Frances Nehring that she purchased two tablets [total] herself, plus three tablets a day were purchased for her by someone else, for five days a week for approximately 104 weeks, Ms. Nehring either purchased or had purchased for her 1,562 tablets.
 
 
 60
 Donald Chandler testified that he purchased three tablets a day. We estimated five days a week for 104 weeks, 1,560 tablets for Donald Chandler.
 
 
 61
 Vickie Cobb testified two tablets per day, and it's five days a week for 52 weeks, 520 tablets.
 
 
 62
 Eula Hall purchased three tablets a day, and if it's five days a week for 52 weeks, that's 780 tablets.
 
 
 63
 Barbara Darling, three tablets per week for 24 weeks is 72 tablets.
 
 
 64
 Rickey Wyatt spent $35,000 for Dilaudid at a maximum price of $55. And if you divide $55 dollars into 35,000, you get 636 tablets.
 
 
 65
 Ann Perdue testified that she purchased one tablet per day; and if you calculated five days a week for twenty weeks, plus two tablets a day five days a week for twelve weeks, then Ms. Perdue purchased 220 tablets.
 
 
 66
 That's a total of 5,350 tablets. Three of them were purchased within a thousand feet of a school, so that gets a total of 5,353 Dilaudid tablets.
 
 
 67
 Number 4 Dilaudid tablets have 90 milligrams each. That comes to a total of 481.7 grams, and the equivalency table in the guidelines provides that 1 gram of Dilaudid is the equivalent of 2 1/2 grams of heroin. And the guideline range for that quantity of heroin is a base level of 32."
 
 
 68
 The court added two points for Ms. Johnson's role in the offense, yielding an adjusted offense level of 34. Combined with a Criminal History Category of IV, the applicable sentence range was 210 to 262 months. The court sentenced Ms. Johnson to 222 months.
 
 
 69
 The defendant argues that the court should only have used the tablets set forth in the indictment, yielding an offense level of 14. This argument is without merit. In considering relevant conduct, the district court is not limited to consideration of the quantity of drugs named in the indictment. United States v. Smith, 887 F.2d 104 (6th Cir.1989); United States v. Sailes, 872 F.2d 735, 737-739 (6th Cir.1989); see also United States v. Perez, 871 F.2d 45, 48 (6th Cir.), cert. denied, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989) (quantities of drugs that were the subject of unconsummated negotiations may be used to calculate the base level of the offense).
 
 
 70
 In the alternative, defendant challenges the method of calculating how many tablets Ms. Johnson sold to Ms. Nehring, Mr. Chandler, and Ms. Hall. This claim is subject to review under the plain error standard, because defense counsel did not advance the claim at the sentencing hearing. Fed.R.Crim.P. 52(b); e.g., United States v. Mack, 837 F.2d 254, 258 (6th Cir.1988). Counsel did state at the sentencing hearing, "Considering the nature of the testimony in this case, it was to[o] nebulous in terms of exact amounts, I think that if we attempted to establish a firm quantity for purposes of sentencing, we would be into the realm of mere speculation." But counsel did not object specifically to the calculations regarding the three witnesses named on appeal.
 
 
 71
 Ms. Nehring testified that she purchased drugs from defendant, usually through her boyfriend, from 1984 to 1986. This is from where the 104-weeks figure comes. But she also testified that she purchased five tablets a day, five days a week. The probation department used a three-tablet-a-day figure. Ms. Nehring testified that she was in a treatment center for 30 days, and also that there were some days that she could not obtain any pills. Given her testimony, given the conservative approach of the probation department, and given the fact that there was no specific objection, use of the 1,562 tablet figure strikes us as unexceptionable.
 
 
 72
 Mr. Chandler testified that he used four to six Dilaudids a day from 1984 to the end of 1986. He made purchases from Ms. Johnson at least thirty, forty, or fifty times. On cross-examination, he testified that he was at Ms. Johnson's house to buy Dilaudids almost every day from January to October of 1986. The defendant argues the court should have used the three-tablet-a-day figure for these 10 months only. The record, however, would support a five-tablet figure, for a total of 1500, and this does not even begin to consider how many tablets may have been purchased in 1984 and 1985. Although the testimony is ambiguous in places, given the support in the record for even larger sales, the court's finding is not plain error.
 
 
 73
 Ms. Hall testified that she bought every day for over one year. At another point, she testified that she did not have money every day, implying that she only bought on days that she did have money. It would appear that she made purchases several days a week. The government concedes that the calculation of three tablets per day is not supported by the record, but argues that the error is harmless. Even the elimination of all 780 pills attributed to Ms. Hall would leave a drug equivalency of 1.029 kilograms of heroin, and the offense level would not be affected.
 
 
 74
 The conviction and sentence are AFFIRMED.
 
 
 
 *
 The Honorable Frank J. Battisti, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Ms. Carter, the defendant's mother, pleaded guilty to the conspiracy count, the only one that named her